IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| PINNACLE QUEST INTERNATIONAL, | ) |
| SYNERGY PRODUCTIONS | ) |
| INTERNATIONAL, INC., MCD | ) |
| PRODUCTIONS, | ) |
| CLAUDIA HIRMER, MARK HIRMER, | ) |
| BRIAN BARKER, | ) |
| TONYA HOLDER, JOSHUA HOLDER, | ) Civil No. |
| ARMAND BRIGHT, S. ANTHONY LARSON, | ) |
| DOUGLAS HAGERTY, | ) |
| MICHAEL LEONARD, | ) |
| ARNOLD MANANSALA, | ) |
| NADINE GRIFFIN, | ) |
| ELLEN STUBENHAUS, | ) |
| DOVER PERRY, | ) |
| JOSEPH MCPHILLIPS, LEE WILLIAMS, | ) |
| and MICHELE BROWN, | ) |
| | ) |
| Defendants. | ) |

## <u>COMPLAINT FOR PERMANENT INJUNCTION</u>

### Nature of Action

1. This is a civil action brought by the United States of America under §§ 7402

and 7408 of the Internal Revenue Code (26 U.S.C.) (I.R.C.) to enjoin the above-named

individuals, Pinnacle Quest International (PQI), Synergy Productions International, Inc.

(SPI), and MCD Productions (MCD), and all those in active concert or participation with them, from:

(a)  Organizing, promoting, or selling (or helping others to organize, promote, or sell) the tax-fraud schemes described herein, and any other tax shelter, plan, or arrangement, that incites or assists customers to attempt to violate the internal revenue laws or evade the assessment or collection of their federal tax liabilities or claim improper tax refunds;

(b) engaging in activity subject to penalty under 26 U.S.C. § 6700, including making, in connection with the organization or sale of any plan or arrangement, any statement about the securing of any tax benefit that the defendant knows or has reason to know is false or fraudulent as to any material matter; and

(c) engaging in conduct subject to penalty under any provision of the Internal Revenue Code, or engaging in any other conduct that substantially interferes with the proper administration and enforcement of the internal revenue laws.

2.  This action has been requested by the Chief Counsel of the Internal Revenue Service, a delegate of the Secretary of the Treasury, and commenced at the direction of a delegate of the Attorney General of the United States, under the provisions of I.R.C. §§ 7402 and 7408.

3. Jurisdiction exists under 28 U.S.C. §§ 1340 and 1345, and I.R.C. §§ 7402(a) and 7408(a).

4. The United States' knowledge of Defendants' harm to the government was enhanced from leads and information developed by the Joint International Tax Shelter Information Centre (JITSIC).

**Defendants**

5. Claudia Hirmer is a member of PQI's Executive Council and its de facto leader. She is also an events director for SPI and an employee or agent of MCD. From 2002 to 2006, Claudia Hirmer earned approximately $320,000 in commissions on the sale of PQI products. Claudia Hirmer conducts business on behalf of these three organizations from multiple addresses in Fort Walton Beach, Florida, within this judicial district and division. Claudia Hirmer resides in Niceville, Florida.

6. Mark Hirmer, Claudia Hirmer's husband, is the owner of MCD and an accounts manager for SPI. Mark Hirmer conducts business on behalf of SPI and MCD from multiple addresses in Fort Walton Beach, Florida, within this judicial district and division. Mark Hirmer resides in Niceville, Florida.

7. Brian Barker is a manager of MCD, a business entity operating from within this judicial district and division. Barker resides in Destin, Florida.

8. Tonya Holder is the daughter of Claudia and Mark Hirmer. Tonya Holder is an events director for SPI, a business entity operating from within this judicial district and division. Tonya Holder resides in Destin, Florida.

9. Joshua Holder is the husband of Tonya Holder. He participates in organizing the activities of SPI, a business entity operating from within this judicial district and division. Joshua Holder resides in Destin, Florida.

10. Armand Bright is or was a member of PQI's Executive Council, which organizes and directs PQI's activities. PQI's principal place of business is within this judicial district and division. From 2002 to 2006, Bright earned approximately $560,000 in commissions on the sale of PQI products. Bright resides in El Cajon, California.

11. S. Anthony Larson is or was a member of PQI's Executive Council and sits on the Executive Council's Ethics Committee. Before joining PQI, Larson was a salesperson for the Institute of Global Prosperity ("Global Prosperity"). From 2002 to 2006, Larson earned approximately $1.2 million dollars in commissions on the sale of PQI products. Larson resides in Seattle, Washington.

12. Douglas Hagerty is or was a member of PQI's Executive Council. From 2002 to 2006, Hagerty earned approximately $138,000 in commissions on the sale of PQI products. Hagerty resides in Kent, Washington.

- 4 -

13.  Michael Leonard is or was a member of PQI's Executive Council.  From 2002 to 2006, Leonard earned approximately $827,000 in commissions on the sale of PQI products.  Leonard resides in Elmira, New York.

14.  Arnold Manansala is or was a member of PQI's Executive Council. From 2002 to 2006, Manansala earned approximately $367,000 in commissions on the sale of PQI products.  Manansala resides in Renton, Washington.

15.  Nadine Griffin is or was a member of PQI's Executive Council. From 2002 to 2006, Griffin earned approximately $665,000 in commissions on the sale of PQI products.  Griffin resides in Danvers, Massachusetts.

16.  Ellen Stubenhaus is or was a member of PQI's Executive Council. From 2002 to 2006, Stubenhaus earned approximately $1.7 million in commissions on the sale of PQI products.  Stubenhaus resides in Doral, Florida.

17.  Dover Perry is or was a member of PQI's Executive Council. From 2002 to 2006, Perry earned approximately $349,000 in commissions on the sale of PQI products. Perry resides in Renton, Washington.

18.  Joseph McPhillips is or was a member of PQI's Executive Council.  From 2002 to 2006, McPhillips earned approximately $1.6 million in commissions on the sale of PQI products.  McPhillips resides in Colorado Springs, Colorado.

19.  Lee Williams is or was a member of PQI's Executive Council.  From 2002 to 2006, Williams earned approximately $231,000 in commissions on the sale of PQI products.  Williams resides in Crystal Beach, Florida.

20.  Michele Brown is or was a member of PQI's Executive Council.  From 2002 to 2006, Brown earned approximately $633,000 in commissions on the sale of PQI products.  Brown resides in Holly Springs, North Carolina.

21.  PQI is an unincorporated organization conducting business from several addresses within this judicial district and division, including 838 Tropic Avenue, Fort Walton Beach, Florida; 50 Hill Avenue NW #A, Fort Walton Beach, Florida; and 13 NE Eglin Parkway #126, Fort Walton Beach, Florida.  PQI does business under the names "Pinnacle Quest International," "PQI," "PQI, Inc.," "Pinnacle," and "Pinnacle Quest."  PQI holds itself out as a Panamanian International Business Company (IBC), but is in reality a collection of individuals carrying on a fraudulent promotion for profit.

22.  SPI is an incorporated organization that supports the fraudulent business activities of PQI.  SPI operates from two addresses within this judicial district and division and one address in St. Louis, Missouri.  In this judicial district and division, SPI operates from 838 Tropic Avenue, Fort Walton Beach, Florida; 50 Hill Avenue NW #A, Fort Walton Beach, Florida; and P.O. Box 1839, Fort Walton Beach, Florida.  In Missouri, SPI maintains a mail drop at 11970 Borman Avenue, Suite 250, St. Louis,

Missouri; mail from this address is forwarded to an address in Fort Walton Beach, Florida.

23.  MCD is an unincorporated business entity that supports the fraudulent business activities of PQI and SPI.  MCD operates from two addresses within this judicial district and division: 13 NE Eglin Parkway, #126, Fort Walton Beach, Florida; and 50 Hill NW #A, Fort Walton Beach, Florida.

**PQI's History**

24.  PQI is a successor organization to the Institute of Global Prosperity, which ceased operations in 2002.  Global Prosperity's products falsely assured customers they could legally stop paying federal income taxes without repercussion.  The sale of these products caused five state attorneys general to issue cease and desist orders to Global Prosperity.

25.  One of Global Prosperity's founders, David Alan Struckman, formed PQI in 2002 using the customer list and certain technology—including a sales database—that Global Prosperity had used.  Claudia Hirmer served as Global Prosperity's marketing director and was the Global Prosperity representative responsible for creating Global Prosperity's website and administering its sales database.

26.  Global Prosperity produced a series of audio tapes that new members purchased for $1,250 to become Global Prosperity members.  Global Prosperity also

hosted offshore seminars called Global II and Global III at which attendees were offered the opportunity to buy the products of tax-fraud promoters.

27. Despite the cease and desist orders, under Struckman's guidance, PQI began offering for sale products very similar to those formerly offered by Global Prosperity. PQI formed its original sales force by allowing Global Prosperity salespeople to pay a fee in exchange for permission to promote PQI products. One Global Prosperity principal has referred to the transition from Global Prosperity to PQI nothing more than a "name change."

28. In 2004, David Struckman and other Global Prosperity founders were indicted on charges of conspiracy to defraud the federal government. Two Global Prosperity founders pled guilty to charges of conspiracy to defraud the government in 2004. Following the indictment, David Struckman fled to Panama to avoid justice, but the Panamanian government subsequently deported Struckman to the United States to stand trial. A federal jury in Seattle, Washington convicted Struckman of tax evasion and conspiracy to defraud the government on November 8, 2007.

### PQI's Products

29. PQI sells three products, named Q1, Q2, and Q3. These products are promoted by a team of approximately 830 PQI-authorized "Qualified Consultants," and PQI customers must purchase these products from Qualified Consultants in a prescribed sequence.

- 8 -

30. PQI is a multilevel marketing scheme. Qualified Consultants are individually authorized by PQI to sell one, two, or all three of PQI's products, depending on the Qualified Consultant's previous sales record. In order for a customer to become a Qualified Consultant for any of PQI's three products, the customer must purchase the product and refer two sales of that product to the Qualified Consultant from whom the customer purchased that product.

31. Qualified Consultants pay PQI $99 per year to serve as Qualified Consultants, and in return, they receive a portion of the purchase price of each PQI product they sell.

32. PQI's multilevel marketing structure creates strong financial incentives for Qualified Consultants to sell PQI products and to convince their customers to become Qualified Consultants.

a. PQI sells Q1 to customers for $1,350, of which the Qualified Consultant retains $1,000.

b. PQI sells Q2 to customers for $7,500, of which the Qualified Consultant retains $6,000.

c. PQI sells Q3 to customers for $18,500, of which the Qualified Consultant retains $12,000.

33.  PQI's multilevel marketing scheme is lucrative for Qualified Consultants. From 2002 to 2006, the Executive Council members named in this complaint had combined commissions on PQI products of approximately $8.8 million.

34.  Approximately 46 Qualified Consultants have earned at least $100,000 in commissions selling PQI products.

35.  The first product, Q1, is a package of purported "educational" resources created by PQI.  Qualified Consultants tell potential customers that when they purchase Q1, they receive a 21-hour "educational" course on audio compact discs, access to an online resource center, and access to PQI-vetted experts in various fields, including federal income taxes, financial planning, and alternative medicine.  In order to access the online resource center or to consult with these supposed experts, the customer must first purchase Q1.

36.  PQI's 21-hour compact disc promotional course consists of recorded interviews of individuals purported to have expertise in a particular subject matter. Claudia Hirmer is the interviewer on some of these discs.  The interviewed speakers make the following false statements about the federal income tax laws:

> a.  The Sixteenth Amendment to the United States Constitution was not properly ratified, and consequently, direct taxes by Congress upon individual citizens are unconstitutional.

b.  The Internal Revenue Code does not require United States citizens to pay federal taxes on income earned from wage labor.

c.  IRS employees do not have authority to assess taxes against individuals, and IRS agents are personally liable to taxpayers for taxes they collect from individuals.

d.  The IRS establishes federal income tax liabilities against United States citizens by fraudulently recording in internal IRS documents that the citizens reside in a United States territory or engages in excise-taxable activities such as drug trafficking.

e.  The Internal Revenue Code does not apply to United States citizens who are not federal employees and who do not live within a federally-administered territory or possession.

37.  In addition to these false statements, PQI's Q1 contains false commercial speech advertising Bill Benson's Reliance Defense package and IMF Decoder's decoding services.  These fraudulent tax-evasion products are discussed in detail below.  One disc also contains frivolous tax arguments presented by Sherry Peel Jackson, a PQI promoter who is currently serving a four-year prison term for federal tax crimes.

38.  PQI's online resource center is a collection of written materials prepared by various individuals and touted by PQI as presenting true information not widely available to the public.  PQI asserts this information is intended to dispel "frauds" imposed on the

- 11 -

public by politicians, bureaucrats, and the government.  Written materials presented in the online resource center make the following false statements—among many others—about the federal tax laws:

a.  The IRS is not a federal government agency because it was not created by an act of Congress;

b.  United States citizens working within a state of the United States are liable for income taxes only if they complete a Form W-4 with a Social Security number;

c.  Individuals working within the fifty states are liable for federal income taxes only if they are employed by the federal government;

d.  IRS revenue agents and officers are actually employed by the Department of the Treasury for the Bureau of Puerto Rico and are without authority in the fifty states of the union; and

e.  The 16th Amendment to the United States Constitution was not properly ratified, and accordingly, direct taxes upon individuals are unconstitutional.

39.  PQI and the other defendants use the false statements contained in the compact disc course and the online resource center to persuade customers that they are under no legal obligation to pay federal income taxes.  PQI, speaking through its Qualified Consultants and the online resource center, tells customers they can learn how

to protect themselves against alleged government-perpetrated frauds—such as the obligation to pay federal income taxes—by using the services of PQI-vetted experts.

40.  PQI, acting through its Qualified Consultants, attempts to sell Q1 purchasers tickets to attend PQI's Q2 and Q3 conferences at which the PQI-vetted experts offer their services for sale.  The PQI Q2 and Q3 seminars at posh resorts and hotels in Mexico, Panama, Malta, and Paris provide customers with one-stop shopping for all their tax-fraud needs.  After buying a scheme that purports to eliminate their federal income taxes through "decoding" and "rebuttal," customers can go across the aisle to a different vendor, who offers a so-called asset protection scheme—just in case the IRS isn't persuaded by the first vendor's "rebuttal."  These schemes are described in detail below.

41.  Q2 is a multi-day conference available to customers who have already purchased Q1.  PQI charges customers $7,500 to attend the Q2 conference, which does not include most meals, lodging, or airfare expenses.

42.  At Q2 conferences, PQI presents customers with PQI-vetted speakers who offer services or investment opportunities.  PQI claims these services and investments build on the general information presented in the Q1 course.  Several vendors who appear at Q2 conferences promote schemes advocating or facilitating illegal non-filing of federal income tax returns and violations of federal tax laws.  Each vendor must pay PQI to appear at the Q2 conference.  The fraudulent conduct of specific vendors is discussed below.

43.  PQI generally organizes one or two Q2 events per year.  Attending a Q2 conference is a prerequisite for attending a Q3 conference.  PQI has organized approximately nine Q2 conferences since 2002.  Among these nine, PQI held Q2 conferences in the following locations on the dates indicated:

| Date of Conference | City and Country | Location |
|---|---|---|
| December 8-12, 2002 | Punta Cana, Dominican Republic | The Barceló Bávaro Beach Resort |
| December 6-12, 2003 | Cancun, Mexico | Hilton Cancun |
| June 20-26, 2004 | Cabo San Lucas, Mexico | Crowne Plaza Hotel |
| February 19-25, 2005 | Cancun, Mexico | Hilton Resort & Hotel |
| October 22-30, 2005 | Ixtapa, Mexico | Melia Azul Ixtapa Resort |
| May 23-June 3, 2006 | Cancun, Mexico | Moon Palace |
| December 2-9, 2006 | Cancun, Mexico | Unknown |
| September 16-22, 2007 | Cancun, Mexico | Moon Palace |

44.  Approximately 2,500 individuals and 15 PQI-vetted vendors attended the October, 2005 Q2 conference in Ixtapa, Mexico.

45.  A tenth Q2 conference is scheduled for May 18-24, 2008 at the Moon Palace in Cancun, Mexico.  A copy of PQI promotional literature advertising this event is attached as Government Exhibit 1.

46.  Customers who have attended a Q2 conference are eligible to attend a Q3 conference, which is a multi-day offshore conference at which similar PQI-vetted

services and investments are presented and sold.  Customers pay $18,750 to attend the Q3 conference, which does not include the price of airfare to and from the conference.

47.  Certain of the vendors that present fraudulent tax-evasion schemes at the Q2 conferences hawk these same wares at the Q3 conferences.  Each vendor must pay PQI to appear at the Q3 conference.  The fraudulent conduct of specific vendors is discussed below.

48.  PQI has organized three Q3 conferences since 2002.  PQI hosted a Q3 conference at the Marriott Hotel in Panama City, Panama, September 19-25, 2004, and another at the Radisson SAS Golden Sands in Malta, February 25-March 5, 2006.  Approximately 400 people and 10 vendors attended the Q3 conference in Malta.

49.  In 2007 PQI hosted a 400-person Q3 conference aboard the Celebrity Cruise Line ship *Galaxy,* promoting a smorgasbord of tax fraud at sea.  Ports of call during the May 14-21 Mediterranean cruise included Rome, Italy; Piraeus, Greece; Kusadasi, Turkey; Santorini, Greece; and Mykonos, Greece.  Sherry Peel Jackson spoke about her frivolous tax-avoidance arguments at this Q3 conference just a few weeks after her April 13, 2007 federal indictment in the Northern District of Georgia for willful failure to file federal income tax returns.  Tonya Holder and Claudia Hirmer were the two defendants primarily responsible for organizing the May, 2007 Q3.  Two promotional documents advertising this Q3 conference are attached as Government Exhibit 2.

50. PQI is scheduled to host a fourth Q3 conference at the Westin Paris, April 12-19, 2009. PQI advertises that this meeting is where

> business meets pleasure. Memorable meetings don't remain mere gatherings of like-minded people; instead they are a balance of business and pleasure, of aspiration and insight, of ideas and actions, and of productivity in luxury.

A copy of PQI promotional literature advertising this event is attached as Government Exhibit 3.

51. At Q2 and Q3 conferences, PQI-vetted speakers instruct attendees that they should conduct their own research, which the speakers refer to as "due diligence," on all investments and products offered for sale at the conference. PQI explains that customers should consult with attorneys or financial advisers before investing or purchasing the services of experts. But PQI also tells customers that they cannot trust the advice of their attorneys or financial advisers because these individuals will lie to perpetuate the alleged frauds that PQI's "educational" materials claim to dispel.

52. In addition to fraudulent tax-evasion schemes, vendors at PQI conferences have promoted these goods, services, and investments:

a. An electromagnetic technology allegedly suppressed by the American Medical Association that can supposedly cure tuberculosis, certain cancers, polio, spinal meningitis, tetanus, and pneumonia;

b. Supposedly anonymous means by which to trade stocks, commodities, and currency;

- 16 -

    c.  Allegedly "unbreachable" computer security systems;

    d.  Personal products that allegedly affect an individual's electromagnetic field so as to reduce stress;

    e.  Real estate deals in Costa Rica;

    f.  Anonymous means of obtaining money orders so as to avoid having to provide a Social Security number to a bank;

    g.  Tax and residency programs allegedly available in Panama for teak farmers;

    h.  Courses available to allegedly help individuals create "real" wealth by removing emotional and mental conflicts in their consciousness with regard to making and spending money.

### PQI Is Operated by its Executive Council

53. The PQI Executive Council is composed of 15 to 25 people who collectively operate PQI for profit.  PQI Qualified Consultants who have a sufficiently robust sales record are elected to the Executive Council by the existing Executive Council members. Because Executive Council members are also PQI sales personnel, Executive Council members stand to realize a personal pecuniary gain from the profitable operation and growth of PQI.

54.  PQI, acting through its Executive Council, creates relationships with entities and individuals who desire to sell their products and services to PQI's customers.  PQI

- 17 -

uses exclusive, mutually beneficial contracts with these vendors as a part of its strategy to sell more Q1, Q2, and Q3 products.

## PQI's Executive Council Vets all Vendors

55.  Before a vendor may sell its products to PQI's customers, PQI's Executive Council reviews an application completed by the vendor that, *inter alia*, explains the following: whether the product is based on existing laws or codes; whether the product has ever been challenged by a government entity or failed to withstand government scrutiny; whether the vendor's principals are involved in any litigation; and existing or pending legislation that may adversely affect the vendor's product line.  PQI's Executive Council does not require the vendors to certify that their products comply with existing laws and regulations.

56.  A subcommittee of the Executive Council reviews these applications as one part of a PQI investigation of the vendor and product to be offered.  The entire Executive Council then votes on whether to permit a vendor to become a PQI-approved vendor. The Executive Council of PQI requires that only products that have been vetted may be offered to PQI customers.  Under an agreement formed between PQI and the vendor, PQI has the right to review the vendor's products quarterly.

- 18 -

57. In marketing its Q2 and Q3 conferences, PQI and PQI's Qualified Consultants assure PQI customers that all products that will be presented have been vetted by PQI. A PQI-approved speaker at the Q2 and Q3 conferences reminds attendees that PQI has vetted and approved all products available for purchase at the conference. Speakers at Q2 conferences tell customers that no one has ever lost money investing in a scheme or product presented at a Q2 conference.

58. PQI's Executive Council revokes certain vendors' authority to sell to PQI customers, and PQI explains the reasons for these decisions on a portion of its website. No vendor's authority has been revoked for violating (or failing to comply with) federal tax laws.

**PQI and Vendors Have an Exclusive Dealing Arrangement**

59. As a condition of obtaining the PQI Executive Council's approval to market a vendor's products to PQI customers, PQI insists that vendors not deal with any PQI competitor. Under the agreement, PQI's Executive Council decides what organizations are competitors.

60. As a further condition, the vendor must agree that it will not sell its scheme or investment to any customer under any circumstances if the customer has not first purchased Q1 from a PQI-approved Qualified Consultant. To facilitate this process, PQI has allowed employees of certain vendors to become PQI-approved Qualified Consultants so that an agent of the vendor can sell both Q1 and the vendor's product.

- 19 -

61.  A PQI Executive Council has described PQI as similar to a members-only retail store: Only after a customer has become a PQI member by purchasing Q1 may the customer avail himself or herself of the products and investments PQI vendors offer.

62.  Through these exclusive-dealing arrangements, PQI makes its Q1 "educational" course a de facto component of all schemes and investments sold by PQI vendors, including the fraudulent tax-evasion schemes sold by certain PQI-approved vendors, described in detail below.

### PQI and its Vendors Promote Each Other Through Advertising

63.  PQI's website carries advertisements for PQI-approved vendors that promote fraudulent tax schemes, as explained in more detail below.

64.  PQI issues three-way call lists that PQI's Qualified Consultants use to promote the services of vendors as a means of inducing potential customers to purchase Q1 from PQI.  While on the phone with a potential customer, the Qualified Consultant can place a third-party call to an existing customer listed on the three-way call list, and the existing customer will extol the virtues of a particular vendor's products to the potential customer.

65.  PQI allows its Qualified Consultants to maintain their own websites, and PQI offers its Qualified Consultants the opportunity to place on these websites links to certain PQI-approved vendors' websites.  In particular, PQI facilitates Qualified Consultants linking their personal websites to Bill Benson's website, which has offered services

- 20 -

designed to help customer evade federal taxes.  The U.S. District Court for the Northern

District of Illinois recently enjoined Benson from promoting his tax-fraud scheme.  See

http://www.usdoj.gov/tax/txdv08020.htm.

66.  PQI sends emails to its customers advertising the products of its vendors,

including vendors that aid and abet federal tax law violations, such as IMF Decoder and

SORCE, whose fraudulent tax schemes are described in detail below.

67.  Certain PQI-approved vendors, including Bill Benson, IMF Decoder, and

SORCE, advertise or advertised for PQI on their websites.

**PQI-Approved Vendors Promote Tax-Evasion Schemes**

68.  PQI's Executive Council has approved numerous vendors to market their

goods to PQI customers despite these vendors' promotion of tax schemes that are

obviously fraudulent.  In fact, PQI vendors were a Who's Who of notorious tax defiers,

including Sherry Peel Jackson (recently convicted of federal tax crimes), Bill Benson

(recently enjoined for promoting his tax-fraud scheme, and previously convicted of tax

evasion) and David Carroll Stephenson (enjoined from promoting tax scams and then

later convicted of conspiring to defraud the government).

69.  Southern Oregon Resource Center Educational Service (SORCE), organized

by Gino Casternovia, is or was a PQI-approved vendor that sells a fraudulent tax scheme.

a.  SORCE, acting through Casternovia, Rod Hagopian,  Rob

Pendell, and Mark Lyon, promotes scams that involve the sale and use of

- 21 -

sham entities, including what it calls international business corporations (IBCs), private interest foundations (PIFs), pure foreign common law trusts, and Nevada Limited Liability Corporations.

b. SORCE promotes and sells two primary tax-fraud schemes: "asset protection" and "disenfranchisement."

c. Through the "asset protection" scheme, SORCE helps people evade federal tax by helping them create bogus entities to which the customers transfer and hide their personal assets and businesses, while maintaining complete control over them. SORCE falsely tells customers that income generated by these businesses and assets is not taxable. To help its customers accomplish these unlawful transfers, SORCE provides the customers with instructional materials, guidance, and staff support.

d. Through its "disenfranchisement" tax-fraud scheme, SORCE falsely tells customers that the federal income tax system is voluntary, and that they can opt out of their federal income tax obligations simply by revoking their social security numbers and other government identification numbers.

e. PQI's Executive Council has vetted SORCE's tax-fraud schemes, approved these schemes for sale to PQI customers, and allowed SORCE to present these schemes at Q2 and Q3 conferences.

- 22 -

70. IMF Decoder, formerly known as IRS Codebusters, is organized by Sharon Kukhahn, Daniel Shaw, and Robbie Struckman. It is or was a PQI-approved vendor that sells a fraudulent tax scheme.

a. Through seminars, promotional materials, and websites, IMF Decoder sells a multi-phase program that falsely claims that (1) customers are not required to pay federal income taxes unless they are living in a United States territory and (2) United States residents can be taxed only by a federal excise tax and only if they are involved in an excise-taxable enterprise. IMF Decoder further falsely tells customers that in order to subject citizens to a tax, the IRS fraudulently misidentifies citizens as residents of a U.S. territory such as the U.S. Virgin Islands and/or misidentifies their occupations as an enterprise subject to an excise tax, such as firearms manufacturing or narcotics trafficking.

b. The first phase of the program provides the customer a Freedom of Information Act ("FOIA") form that requests the IRS to produce a transcript of the customer's IMF (individual master file). Once the customer receives a copy of his or her IMF transcript, under the second phase of the program IMF Decoder "decodes" the transcript to determine if the IRS had fraudulently converted the customer's residence to a

territory and/or occupation to an excise taxable enterprise in order to tax the customer.

c. After determining that the IRS supposedly fraudulently misidentified the customer's residence and/or occupation in the customer's IMF, during the third phase IMF Decoder prepares a "rebuttal letter" to the IRS demanding that the IRS correct "false and unlawful entries" and produce "lawful documentation evidencing" that the customer is subject to internal revenue laws and is required to pay income taxes; and that the IRS cease and desist all actions against the customer.

d. The final phase of the "decoding" process, consists of obtaining certified copies of the documents obtained through the FOIA process that purportedly demonstrate that the customer is not required to file a federal tax return. IMF Decoder falsely advises customers that they can use these documents as evidence to show they are not obligated to file a federal income tax return in the "unlikely" event the customer's claim that he/she is not required to file federal tax returns is challenged in court.

e. PQI's Executive Council has vetted IMF Decoder's fraudulent tax schemes, approved these schemes for sale to PQI customers, and allowed IMF Decoder to present these schemes on Q1 audio compact disc course and at Q2 and Q3 conferences.

71.  Bill Benson is or was authorized by PQI to promote his fraudulent tax scheme called the Reliance Defense Package to PQI customers.

a.  Benson assured PQI customers that they were not required to file federal income tax returns based on his false claim that the Sixteenth Amendment to the United States Constitution was not properly ratified.

b.  Benson also sold PQI customers products that Benson falsely promised would shield these customers from criminal prosecution for not paying federal income taxes.

c.  Benson advertised this scheme on PQI's Q1 compact disc course and at Q2 conferences.

d.  PQI Qualified Consultants could link to Benson's webpage from their own websites with PQI approval.

e.  The United States sued Benson to enjoin this sale of the Reliance Defense Package on November 10, 2004.  The federal district court for the Northern District of Illinois permanently enjoined Benson from selling this fraudulent tax scheme on January 11, 2008.

72.  PQI-approved vendor Sherry Peel Jackson sold materials that fraudulently purport to help customers avoid federal tax by showing that they are not required to pay federal income taxes.

a.  Jackson, a former I.R.S. Revenue Agent, based her argument on a false and tortured reading of section 861of the Internal Revenue Code that has been consistently rejected by courts.

b.  Jackson advocated her frivolous positions on PQI's Q1 "educational" audio course and promoted the sale of her "861 Evidence Disc" at Q2 and Q3 conferences.  This disc purports to explain why U.S. citizens are not obligated to pay federal income taxes or file federal income tax returns.

c.  Jackson also marketed at PQI conferences a DVD titled "Breaking the Invisible Shackles - Sherry Peel-Jackson Speaks Out," on which she discusses IRS audit techniques, interview questions, and methods for determining unreported income.  Jackson sold this DVD to PQI customers for $40.

d.  Jackson was convicted last November in the U.S. District Court for the Northern District of Georgia of four counts of willfully failing to file federal income tax returns.  She is currently serving a four-year prison sentence for those crimes.

e.  Jackson was also a PQI Qualified Consultant, and from 2002 to 2006, Jackson earned approximately $138,000 in commissions on the sale of PQI products.

- 26 -

73.  American Business Estate and Tax Planning (ABETP, a.k.a. ABEP), organized by David Carroll Stephenson and Michael Shanahan, was a PQI-approved vendor prior to May, 2004.  Stephenson falsely advised PQI customers they could avoid paying federal income taxes on income and assets placed into "pure equity trusts" over which the customer retained full control.  Stephenson was enjoined from promoting his scheme in 2004.  See http://www.usdoj.gov/tax/txdv04155.htm and http://www.usdoj.gov/tax/prtax/Stephenson_DefaultudgPermInj%20.pdf.   In 2006 Shanahan pled guilty to federal charges of conspiracy to defraud the government and willful failure to file federal income tax returns.  See http://www.usdoj.gov/tax/txdv06680.html.  A jury convicted Stephenson of these charges.  See http://www.usdoj.gov/tax/txdv06092.htm.

### Knowledge of Illegal Conduct

74.  Members of PQI's Executive Council have reason to know and know that their conduct and their false statements about the tax laws help PQI vendors sell tax-fraud schemes.  For example:

> a.  In 2003 the Justice Department sued David Carroll Stephenson to enjoin him from promoting his tax-fraud scheme. The complaint and motion for preliminary injunction clearly described the illegal nature of Stephenson's scheme.  See http://www.usdoj.gov/tax/txdv03720.htm and http://www.usdoj.gov/tax/txdv04155.htm.

- 27 -

b.  In May 2004, PQI founder and former PQI Executive Council member David Struckman was indicted for his role in the Institute of Global Prosperity, an organization that offered products similar to those offered by PQI.  Struckman was convicted in 2007 of conspiracy to defraud the government.

d.  In November 2004, the United States filed a complaint for permanent injunction against PQI-vetted vendor Bill Benson for selling a fraudulent tax scheme similar to other tax-fraud schemes that PQI vendors sell.  The court enjoined Benson in November, 2007.

e.  The principals of former PQI-approved vendor ABETP were found guilty of conspiring to defraud the government in 2006 for offering for sale sham trusts similar in nature to products PQI vendors currently offer for sale.

f.  Sherry Jackson Peel, a presenter at many PQI-sponsored conferences, including the May, 2007 Q3 conference aboard the Celebrity Cruise Line ship *Galaxy*, was indicted and convicted in 2007 of willfully failing to file federal income tax returns.

g.  PQI has posted the following on its website:

"WE THE PEOPLE organization is another group very much involved in educating people through professionals and written proof about the current Federal Income Tax being unlawful. Check

- 28 -

out this web site, then click on the Contact Us button found on this web site for further information. http://www.givemeliberty.org."

In August, 2007, the Northern District of New York enjoined We the People and Robert Schulz from promoting a tax-avoidance scheme based on the premise that the 16th Amendment to the Constitution was improperly ratified, that Congress lacks taxing authority outside the District of Columbia and federal territories, and that U.S. citizens are not legally required to prepare and file federal income tax returns.  A copy of the injunction order is posted on We the People's website.  We the People's frivolous arguments regarding the internal revenue laws are essentially identical to arguments presented by PQI-approved vendors.  See http://www.usdoj.gov/tax/prtax/txdv07595.htm.

75.  PQI is a continuation of Global Prosperity and offers for sale products very similar to those formerly offered for sale by Global Prosperity, which the members of PQI's Executive Council know and have reason to know are fraudulent.

a.  Global Prosperity received cease and desist orders from five states' Attorneys General before PQI opened for business in 2002.

b.  On December 15, 2005, Global Prosperity founder Lorenzo Lamantia pled guilty to felony charges for tax evasion and conspiracy to defraud the government.  See http://www.usdoj.gov/tax/prtax/txdv05674.htm.  In July,

2006, the Department of Justice enjoined Lamantia for his involvement in Global Prosperity.  See http://www.usdoj.gov/tax/prtax/txdv06436.htm.

c.  In July, 2004, Global Prosperity founder Daniel Andersen plead guilty to a tax charge stemming from a conspiracy to defraud the government.

d.  Keith Anderson was a speaker featured on Global Prosperity's audio tapes, which were similar to PQI's Q1.  Keith Anderson promoted the use of fraudulent trusts to avoid paying federal income taxes.  In April, 2005 a jury convicted Anderson of conspiracy to defraud the government, mail and wire fraud, money laundering, and aiding and assisting the filing of false tax returns  http://www.usdoj.gov/opa/pr/2005/April/05_tax_210.htm

76.  Despite these injunction suits and criminal prosecutions, PQI has not ceased approving and promoting similar tax-fraud schemes offered by its vendors.

77.  PQI helps vendors sell their products by assuring customers that PQI has thoroughly investigated the products that the vendor will offer.  But even a cursory review of the legal positions asserted by PQI's tax-scheme vendors would reveal the falsity of their claims.

### SPI's Role in Support of PQI's Fraudulent Activities

78.  Synergy Productions International, Inc. (SPI) supports the fraudulent activities of PQI and its vendors.  PQI's Executive Council determines which products PQI will sell or promote to customers; SPI provides the mechanisms necessary to deliver

those products to the customer and receive payment from the customer. SPI is solely dedicated to serving PQI and serves no other client. SPI is thus a division of PQI and not an independent entity.

79. SPI is operated by Claudia Hirmer and Mark Hirmer, with the assistance of Brian Barker, Tonya Holder, and Joshua Holder.

80. PQI's Qualified Consultants must execute an agreement with SPI in order to become a PQI Qualified Consultant. Completing this agreement allows the Qualified Consultant to place an order for PQI's products through SPI on the customer's behalf. SPI then ships the PQI product directly to the customer. SPI receives all payments made by customers for all PQI products.

81. SPI determines which PQI Qualified Consultants are eligible to sell which of PQI's three products to customers based on the Qualified Consultant's sales record. Under the Qualified Consultant agreement that all Qualified Consultants execute, SPI and PQI share control over the approved sales methods Qualified Consultants may use to promote PQI products.

82. Pursuant to the Qualified Consultant agreement, a subcommittee of PQI's Executive Council determines whether a Qualified Consultant has violated the Qualified Consultant agreement and whether sanctions or termination of consultant status are necessary. PQI forwards its determination to SPI, which is responsible for enforcing PQI's decision.

83.  SPI is exclusively responsible for making all local arrangements for PQI's Q2 and Q3 conferences.  SPI is also responsible for collecting payment from PQI-approved vendors of those fees vendors must pay in order to appear at Q2 and Q3 conferences.

84.  Between January 1, 2003 and December 31, 2004 alone, a bank account held by SPI received deposits exceeding $3.6 million.

### MCD's Role in Support of PQI's Fraudulent Activities

85.  Like SPI, MCD supports the fraudulent activities of PQI.  MCD operates PQI's website, and did or does operate the website for PQI-approved vendor Bill Benson. Before serving PQI, MCD maintained the website for the Institute of Global Prosperity.

86.  MCD is operated by Claudia Hirmer, Mark Hirmer, and Brian Barker.

87.  MCD maintains a database of sales made by PQI's Qualified Consultants that SPI uses to determine which Qualified Consultants may sell which PQI products.

88.  MCD processes credit card sales of PQI products.

89.  MCD maintains a bank account in which funds received from the sale of PQI products are deposited.

### Harm to Government

90.  Defendants' schemes and the schemes of Defendants' vendors harm the government by fraudulently helping customers evade federal taxes and helping customers hide assets and income from the IRS.

- 32 -

91.  The scope of the Defendants' scheme is enormous: From 2002 to 2006,  PQI had gross sales of approximately $54 million.  Of this sum, PQI realized approximately $16 million in sales revenue from the sale of its various products and the approximately 830 Qualified Consultants collectively realized approximately $37 million in sales commissions.

92.  Approximately 11,500 customers have purchased Defendants' tax-fraud schemes.  The fraudulent tax schemes of just two PQI-vetted vendors, IMF Decoder and SORCE, have deprived the United States of over $13 million in forgone federal income tax revenue.

93.  The United States is further harmed because the IRS must dedicate its scarce resources to detecting and examining the inaccurate returns filed by PQI customers as a result of tax-fraud schemes that PQI promotes, and in attempting to assess and collect unpaid taxes.

94.  Some of the revenue loss caused by Defendants' activities may never be recovered.

95.  Defendants' extensive involvement in these numerous and elaborate schemes and their willingness to continue promoting these fraudulent schemes while former PQI members are enjoined, prosecuted, and convicted indicate that the misconduct described in this complaint or other similar misconduct is likely to recur unless Defendants are permanently enjoined.  Defendants plan to promote fraudulent tax-evasion schemes at a

- 33 -

Q2 conference in Cancun, Mexico in May, 2008 and at a Q3 conference in Paris, France in April, 2009.

### Count I:  Injunction under I.R.C. § 7408 for violations of § 6700

96.  The United States incorporates by reference the allegations contained in paragraphs 1 through 95.

97.  I.R.C. § 7408 authorizes a district court to enjoin any person from, *inter alia*, engaging in conduct subject to penalty under I.R.C. § 6700 if the person has engaged in such conduct and injunctive relief is appropriate to prevent recurrence of the conduct.

98.  Section 6700 imposes a penalty on any person who organizes or participates in the sale of a plan or arrangement and in so doing makes a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any tax benefit by participating in the plan or arrangement which that person knows or has reason to know is false or fraudulent as to any material matter.

99.  PQI's plan or arrangement has three major components:

> a.  PQI advertises its products and the products of its vendors through its website, its Qualified Consultants, its three-way call list, and its emails to customers.

> b.  PQI requires that all customers purchase PQI's Q1 audio course before purchasing vendors' fraudulent tax schemes.  In so doing, PQI makes its

Q1 a de facto component of each fraudulent tax scheme PQI's vendors sell, whether that sale occurs before, after, or during a Q2 or Q3 conference.

c. PQI provides a forum, in the form of Q2 and Q3 conferences, for vendors of tax-fraud schemes to sell their products. PQI controls which vendors may appear at these conferences, and PQI agents falsely and fraudulently vouch for the quality of the vendors' products in order to help vendors sell the products.

100. PQI furnishes or causes to be furnished false or fraudulent statements about the tax consequences of participation in its vendors' tax fraud schemes in the following ways:

a. PQI sells Q1 which contains false statements about the federal income tax laws and contains false statements from vendors about the tax benefits of using their products.

b. PQI publishes an online resource center that contains false and fraudulent statements about federal tax laws.

c. PQI provides a forum at which PQI-approved vendors may advertise their fraudulent tax schemes and furnish false statements to customers. By allowing only vendors that PQI approves, PQI implicitly, and in some cases explicitly, vouches for the veracity of the vendors' false speech.

- 35 -

101. Defendants know and have reason to know that these statements are false and fraudulent within the meaning of 26 U.S.C. § 6700.

102. If not enjoined, Defendants will continue to organize and sell tax-fraud schemes.

103. Injunctive relief is appropriate to prevent recurrence of this conduct.

**Count II:  Injunction Under I.R.C. § 7402**

104. The United States incorporates by reference the allegations contained in paragraphs 1 through 103.

105. I.R.C. § 7402(a) authorizes a court to issue injunctions as may be necessary or appropriate for the enforcement of the internal revenue laws, even if the United States has other remedies available for enforcing those laws.

106. Defendants' activities substantially interfere with the enforcement of the internal revenue laws by promoting tax-fraud schemes and noncompliance with federal income tax laws.

107. Defendants' conduct results in irreparable harm to the United States for which the United States has no adequate remedy at law.

108. Unless enjoined by this Court, Defendants are likely to continue to engage in illegal conduct.  The United States is entitled to injunctive relief under I.R.C. § 7402(a).

WHEREFORE, plaintiff, the United States of America, prays for the following relief:

A. That this Court, under 26 U.S.C. §§ 7402 and 7408, enter a permanent injunction prohibiting Defendants and their representatives, agents, servants, employees, and anyone in active concert or participation with them, from directly or indirectly by means of false, deceptive, or misleading commercial speech:

(1) Organizing, promoting, marketing, or selling (or assisting therein) any tax shelter, plan, or arrangement, including but not limited to those described in this complaint, or any other tax shelter, plan or arrangement that incites or assists customers to attempt to violate the internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities or unlawfully claim improper tax refunds;

(2) engaging in activity subject to penalty under 26 U.S.C. § 6700, including making, in connection with the organization or sale of any plan or arrangement, any statement about the securing of any tax benefit that the Defendants know or have reason to know is false or fraudulent as to any material matter;

(3) engaging in conduct subject to penalty under any provision of the Internal Revenue Code, or engaging in any other conduct that interferes

with the proper administration and enforcement of the internal revenue laws.

B.  That this Court allow the government full post-judgment discovery to monitor Defendants' compliance with the injunction;

C.  That this Court order Defendants to provide the United States with a list of all present and former PQI customers and those customers' addresses, phone numbers, and email addresses;

D.  That this Court order Defendants to provide the United States with a list of all persons who attended any Q2 or Q3 conference or other PQI-sponsored event since January 1, 2006, and a list of all persons who have registered to attend any future Q2 or Q3 conference or other PQI-sponsored event, which list shall include those persons' addresses, phone numbers, and email addresses;

E.  That this Court order Defendants to provide the United States with a list of all persons who have ever sold any PQI product, including audio discs or tickets to conferences, which list shall include those persons' addresses, phone numbers, and email addresses;

F.  That this Court order Defendants to provide the United States with a list of all speakers, vendors, and any other persons who have ever sold any product or made any presentation to PQI customers, which list shall include those persons' addresses, phone numbers, and email addresses;

G. That this Court order Defendants to notify all present and former customers, and all PQI vendors that sold tax-related schemes through PQI that those schemes were and are invalid;

H. That this Court order that its permanent injunction be displayed on all websites over which any Defendant has control that pertains in any way to PQI, products or services offered by PQI vendors, SPI, or MCD;

I. That this Court grant the United States such other and further relief as the Court deems just and appropriate.

GREGORY ROBERT MILLER
United States Attorney


*s/ Robert E. Fay*
ROBERT E. FAY
Trial Attorney, Tax Division
U.S. Department of Justice
Va Bar. No. 74871
Post Office Box 7238
Ben Franklin Station
Washington, D.C.  20044
Telephone: (202) 305-9209
Facsimile: (202) 514-6770
Email: Robert.E.Fay@usdoj.gov